IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSHUA TAYLOR, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.: 13-2241 |
| | : | |
| POLICE OFFICER LARRY SHIELDS, | : | |
| Defendant | : | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    June 19, 2017

## I.      INTRODUCTION

Presently before the Court is Plaintiff Joshua Taylor's Motion for New Trial and accompanying memorandum (Doc. No. 95) ("Pl. Br."), Plaintiff's Supplemental Brief in Support of Motion for New Trial (Doc. No. 112) (Pl. Supp. Br."), Defendant's Response in Opposition (Doc. No. 98) ("Def. Br."), Defendant's Supplemental Response in Opposition to Motion for New Trial (Doc. No. 113) ("Def. Supp. Br."),[1] Plaintiff's Supplemental Brief Regarding the Applicability of *Los Angeles v. Mendez* to the Instant Case and Pending Motion for New Trial (Doc. No. 118), and Defendant Police Officer Larry Shields' Reply in Opposition to Plaintiff's Second Supplemental Brief Upon Plaintiff's Motion for New Trial (Doc. No. 119).[2]  Upon

---

[1] On December 5, 2016, Plaintiff filed a Motion for New Trial. (Doc. No. 95.)  After an extension was requested and granted, Defendant filed his response on December 29, 2016. (Doc. No. 98.)  On January 13, 2017, the Court entered an Order providing Plaintiff the opportunity to supplement his motion seven days from the receipt of the full pre-trial and trial transcripts and providing Defendant fourteen days from the filing of the supplemental briefing to respond. (Doc. No. 102.)   In accordance with this Order, Plaintiff filed his supplemental brief on March 3, 2017 and Defendant filed his supplemental response on March 10, 2017. *See* Doc. Nos. 112 and 113.

[2] *See infra* n.7 for a discussion on the supplemental briefings concerning *City of Los Angeles, California v. Mendez*, 2017 WL 2322832 (U.S. May 30, 2017).

consideration of the materials presented and the extensive oral argument held on May 15, 2017, and for the reasons set out within this memorandum, we deny Plaintiff's motion.

## II.     BACKGROUND

This was a civil case arising out of a shooting which took place on April 25, 2011, at Plaintiff's home on Worth Street, Philadelphia, where Plaintiff Joshua Taylor ("Plaintiff" or "Taylor") was shot and seriously injured by Defendant Police Officer Larry Shields ("Defendant" or "Shields").  At trial, Taylor claimed that Shields used excessive force by pursuing him into his home and shooting him in the chest in front of his family.  Taylor sought to recover damages against Shields for violating his Fourth Amendment right to be free from an unlawful seizure of his person brought about by the shooting.  Shields argued that the shooting was justified by Taylor confronting him in the doorway and pointing a gun directly at him.  Taylor now seeks the entry of an order granting him a new trial asserting several claims of trial court error.

The evidence in this excessive force claim was presented to an eight person jury from November 1 to November 4, 2016.  Closing arguments, jury instructions, and jury deliberations took place on November 7, 2016.  The jury returned a verdict for Officer Shields, finding that his use of excessive force was justified.  Taylor's new trial motion has followed and is now ripe for resolution.

## III.     LEGAL STANDARD – MOTION FOR A NEW TRIAL

It is well settled that the "ordering of a new trial is committed to the sound discretion of the district court." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984).  Fed. R. Civ. P. 59(a) sets forth the grounds under which motions for new trial may be considered.  It provides in relevant part:

> (1) *Grounds for New Trial.* The court may, on motion, grant a new trial on all or some of the issues . . . as follows:
>
>> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court

Fed. R. Civ. P. 59(a). In considering the merits of a motion for a new trial based on an asserted error of law, as here, the court must determine whether an error was made and if so determine "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'" *Farra v. Stanley–Bostitch, Inc.*, 838 F.Supp. 1021, 1026 (E.D.Pa.1993) (*citing Bhaya v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601 (E.D.Pa.1989)). The district court shall be given "wide latitude" in making a determination where "the reason for interfering with the jury verdict is a ruling . . . that initially rested within the discretion of the court such as an evidentiary ruling or jury instruction." *Kiss v. Kmart Corp.*, 2001 WL 568974, at *1 (E.D. Pa. May 22, 2001) (citations omitted); *Ries v. CSX Transp., Inc.*, 2000 WL 377509, at *1 (E.D. Pa. Mar. 29, 2000).

## IV.     DISCUSSION

In his motion, Taylor asserts that the Court erred in excluding certain evidence which he offered based on his view that it pertained to the qualifications and reliability of defense expert Dr. Jonathan Arden and further erred by permitting the jury to hear the testimony of Dr. Arden. Taylor also contends that the Court erred in issuing conflicting rulings regarding the use of the Philadelphia police department's off-duty policy, Memorandum 98-1, during trial. We discuss the issues concerning Dr. Arden first.

### A.     Dr. Jonathan Arden

We begin by setting out some background regarding Dr. Arden, his credentials, his report, and how Shields proposed to make use of certain impeachment evidence in the case. We

next consider Taylor's procedural objection concerning his earlier motion in limine to preclude the testimony of Dr. Arden. We then review Taylor's substantive objections concerning Dr. Arden's qualifications, methodology, and opinions.

### 1. Background and Context

On November 28, 2015, within the parameters of the Court's scheduling order, Shields supplemented his Rule 26 disclosures by identifying Dr. Jonathan L. Arden, M.D., a forensic pathologist, as a defense forensics expert. (Doc. 52-1, Exh. A, at 2.) Defense counsel attached Dr. Arden's curriculum vitae ("CV") and the subject matter of his proposed evidence to the disclosure. (*Id.*) On May 11, 2016, Shields served Dr. Arden's report on counsel for Plaintiff. (Doc. 52-1, Exh. C, at 24-32.) Shields offered Dr. Arden to testify about the gunshot wound to Taylor. (*Id.* at 28.) Specifically, Dr. Arden compared the two different scenarios offered by Taylor and Shields in order to determine the consistency of their accounts of the shooting with the trajectory of Taylor's gunshot wound. (*Id.*)

Dr. Arden's CV showed that he completed a medical residency in anatomic pathology at New York University from 1980 to 1983. (Doc. No. 52-1, Exh. A., at 8.) He received training in forensic pathology at the Office of the Chief Medical Examiner for the State of Maryland from 1983 to 1984. (*Id.*) He came to be certified in both specialties by the American Board of Pathology, and is licensed to practice medicine in five states. (*Id.* at 9.) He has also published articles and lectured on forensic pathology. (*Id.* at 10-12.) He worked for twenty years as a government-employed medical examiner, including five years as the Chief Medical Examiner of Washington D.C. ("WOCME") (*Id.* at 8.) He currently provides consulting services in forensic pathology and medicine, and has a part-time appointment as a forensic pathologist in the Office of the Chief Medical Examiner for the State of West Virginia. (*Id.*) Dr. Arden has testified over

800 times as an expert witness, "concerning the determination and analysis of bullet trajectories within bodies, including the assessment of the relative positioning between a gun and the person shot by the gun." (Doc. No. 52-2, Exh. E, at 6, ¶ 7).

In this case, Dr. Arden sought to determine which version of the shooting was consistent with physical evidence of the trajectory of the bullet: Taylor's claim that he was lying on the ground when Shields shot him or Shields' claim that Taylor was standing upright pointing a gun at him when he shot. (Doc. No. 52-1, Exh. C., at 28.) Dr. Arden explained that a review of the CT scan taken of Taylor on May 4, 2011, revealed that the bullet entered his body "approximately at his xyphoid, which is the front surface of the body, and came to rest in his right-rear ribcage, at a level slightly lower (i.e., closer to the feet) than the entrance point, so the trajectory was *backward*, to the right, and downward, relative to the body." (*Id.*) (emphasis added). Dr. Arden further explained that in addition to this CT scan, he also considered the approximate distance between the gun and Taylor, the angle at which the gun was pointed at Taylor, the depth of Taylor's torso, and the height of the gun above the floor and the angulation relative to the floor of the front of Taylor's torso. (*Id.*) Using these factors, Dr. Arden created the following diagram of a side-view of the shooting scenario as offered by Taylor:



(*Id.* at 31.) Dr. Arden opined that under the scenario offered by Taylor, the bullet trajectory would have traveled in an upward angle relative to his body; which, he opined would have been

contrary to the downward trajectory of the bullet path in Taylor's torso. (*Id.* at 29.) He explained that:

> In fact, an informal, common sense approach to this scenario yields the same result . . . . Both by the common sense approach and by manipulating the factors in the scale diagram, the target surface of the front of the body would have to be sitting up at nearly 90° angle in order to create a downward trajectory of the gunshot wound.

(*Id.*) In short, he concluded that while Taylor's version of the shooting would be inconsistent with the objective medical evidence of his gunshot wound, Shields' version was consistent with the objective evidence. (*Id.*)

### 2. The Timeliness of Plaintiff's Motion in Limine to Bar Dr. Arden

Before considering the substantive objections presented by Taylor, we address the procedural posture of this motion. On December 21, 2015, the Court issued an amended Scheduling Order, stating that "[a]ll . . . *Daubert* motions shall be filed no later than **June 20, 2016**." (Doc. 37, ¶ 3 (emphasis in original).) On May 11, 2016, Shields served the Arden report on Plaintiff's counsel. *See* Doc. 52-1, Exh. C, at 25. On September 30, 2016, over **three months** after the June 20, 2016 deadline, Taylor filed his motion in limine seeking to preclude the testimony of Dr. Arden. *See* Doc. 48. The motion failed to address its delayed filing. On October 11, 2016, Shields filed a response to the motion seeking to dismiss it, in pertinent part, as untimely. (Doc. 52, at 2.) On October 13, 2016, Taylor filed a reply arguing that the Court, in its gatekeeper function, had the authority to consider limine motions at any time. (Doc. 57, at 3-4.) Taylor also argued that it sought relief not only based on *Daubert* but also upon Fed. R. Evid. 401 and 403. (Doc. 57, at 3-4.) On October 21, 2016, after consideration of the extensive briefing by the parties as well as the oral argument before the Court on October 20, 2016, and for the reasons discussed at oral argument, we denied the motion. (Doc. No. 72.) We explained that

the motion was out of time and that Taylor failed to set out any "good cause" or "excusable neglect" for that untimely filing. *See* Fed. R. Civ. P. 6(b)(1) and 16; Doc. No. 72. We also noted that the concerns raised by Taylor could be appropriately addressed on cross-examination of Dr. Arden. (*Id.*) We elaborated on this point in the oral argument, stating that despite the untimely filing, we still reviewed the report and concerns raised by Taylor and concluded:

> **I have to conclude that if the answer was that anything can come [in] – you know, regardless of how frivolous the expert opinion might be, regardless if it was absolutely classified based upon junk science, that doesn't sound right to me.** But to the contrary, I can't have – we can't have lawyers just, you know, ignoring the Rule 16 order, and the timing and the consequence of the Rule 16 orders. They're there for a reason . . . you had the report for several months before the deadline ran . . . [and it] wasn't provided until somewhat later. I'm inclined to allow them to go forward with respect to Arden, and I also think that there's – **from what I'm seeing from the review of the report and the way in which you addressed it in the papers, that those things that you – those questions that you raised . . . are questions that could very effectively be raised by way of cross examination**.

(Doc. No. 112, Pl. Supp. Br., Exh. 2, at 15) (emphasis added).

Taylor argues that the Court should not have denied his untimely motion in limine on procedural grounds. (Pl. Br. at 29.) We are unable to accept this proposition as we will not ignore the significance of case management and the benefits it brings to the litigation process. The Third Circuit has explained that: "scheduling orders are at the heart of case management. If they can be disregarded without a specific showing of good cause, their utility will be severely impaired." *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir.1986). At the same time, we acknowledge our responsibility to make certain that evidence to be presented before the jury calling for expert opinions must be properly vetted and must meet the requirements of Fed. R. Civ. P. 702. We will not rest our determination here solely upon the procedural deficiency of

Taylor's failure to present his *Daubert* motion in a timely manner. While we undertook this responsibility prior to ruling on the motion in limine, as detailed by my explanation above during the oral argument, we take this opportunity to more fully detail our reasoning on this issue.

### 3. Substantive Objections

Taylor presents two separate but related substantive arguments regarding Dr. Arden's proffered testimony. In his post trial motion papers, he first asserts that he should have been given the opportunity to question Dr. Arden in front of the jury regarding his mismanagement of and departure from the WOCME on the premise that such information was relevant to Dr. Arden's qualifications under Rule 702.[3] Taylor then asserts that Dr. Arden was not qualified under *Daubert* and Rule 702 to testify regarding ballistics, his methodology was not reliable, and his testimony did not assist the trier of fact. We set out each argument here, provide Shields' response, and conclude with our analysis of the issues.

### a. Dr. Arden's Tenure At The WOCME

With respect to his first argument, Taylor asserts that a "new trial is warranted because the jury should have heard evidence pertaining to Dr. Arden's departure from the [W]OCME and his mismanagement of the [W]OCME." (Pl. Br. at 13.) The proffered evidence covered:

1) Arden's mismanagement of the DC Office of the Chief Medical Examiner, including mishandling of bodies, violations of applicable local laws, maintenance of hazardous facilities, failure to make legally-required reports, and failure to properly conduct autopsies according to applicable standards and practices;

2) Allegations of sexual harassment against Dr. Arden's employees;

---

[3] We also note that when Taylor filed his motions in limine, he did not raise this issue.

3) Allegations of race and religious discrimination against Dr. Arden by Dr. Arden's employees and by members of the general public whose family members had passed away;

4) The circumstances regarding Dr. Arden's departure from the DC Office of Chief Medical Examiner, whereby Arden was put on administrative leave and then resigned.

(*Id.* at 8-9.)

Taylor asserted that this information was relevant to Dr. Arden's qualifications and his credibility under Federal Rules of Evidence 702 and 608. (*Id.* at 13-14.) He explained that Shields' counsel used Dr. Arden's WOCME experience to paint him as "supremely qualified" and that the Court erred by precluding Taylor from questioning Dr. Arden in front of the jury as to his management of the WOCME and the reasons for his resignation. (*Id.* at 13.) Taylor states: "[t]he jury was entitled to know that Dr. Arden was instead a disgraced medical examiner who was forced out of the biggest job he ever had, who had mismanaged the [W]OCME and had violated DC laws in doing so, and who now cannot even get a full-time medical examiner job and is instead relegated to being a part-time examiner in West Virginia." (*Id.*) Moreover, Taylor goes on to assert that Dr. Arden's lack of qualification is bolstered by the fact that his methods were "inherently unscientific," and that "they contradicted the testimony of Dr. Khan – who stated that the bullet curved inside Plaintiff – and Lt. Nolan – who testified that they were not able to determine Taylor's body positioning due to the lack of an exit wound." (*Id.* at 14.)

Taylor expands this argument, stating that the proffered evidence "bec[ame] even more important when considering the stakes of Dr. Arden's testimony." (*Id.* at 15.) Taylor asserts that Dr. Arden was pivotal to the defense as the case centered on a factual dispute – whether Taylor was standing or lying on the ground when Shields approached him – and Shields' only evidence supporting his version of the events was Dr. Arden's testimony. (*Id.*) As such, according to

Taylor, Shields' chief strategy was to make Dr. Arden seem "supremely qualified and reliable." (*Id.*)   Taylor argues that if the jury had heard his intended questioning of Dr. Arden, it would have undermined Dr. Arden's qualifications, and the jury would have not accepted the evidence presented as reliable.[4] (*Id.*)   He asserts that the jury was entitled to know whether he left voluntarily, if he was forced to leave, and the circumstances involved in this decision as this was relevant to the attack of Dr. Arden's qualifications and his credibility.  (*Id.* at 16.)   Accordingly, Taylor contends that there is a "substantial likelihood that the outcome of the litigation would have been different had the jury heard this information." (*Id.* at 16-17.)

Shields responds arguing that the "Court was well within its discretion to exclude that evidence both because the issue was not raised and disclosed in a timely manner, and because the evidence was not relevant impeachment evidence." (Def. Br. at 4.)   He argues that the Court properly excluded the evidence on the grounds that (1) Taylor had failed to previously disclose it; (2) it was not proper impeachment evidence under Rule 608; (3) it was not relevant to the subject matter of Dr. Arden's testimony, and (4) under Fed. R. Civ. P. 403, its introduction would have been distracting and confusing to the jury and its probative value would not have outweighed its prejudicial effect. (Def. Br. at 5.)

We agree with Shields.  Our analysis focuses on whether we erred by not considering the evidence in our determination of whether Dr. Arden should have been permitted to render his opinion at all.   We consider the question first with respect to Fed. R. Evid. 702 and our gatekeeper role. The Rule provides that:

---

[4] Taylor's counsel also notes that "although the Court chided Plaintiff's counsel twice . . . for not raising this issue of Dr. Arden's mismanagement and departure from OCME with the Court ahead of time, Plaintiff's counsel had no obligation to show its hand prior to cross-examination." (Pl. Br. at 16.)  He argues that Defendant's counsel was aware of this issue and could have filed a timely motion in limine if it felt the evidence should have been excluded but chose not to do so. (*Id.*)

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> **(b)** the testimony is based on sufficient facts or data;
>>
>> **(c)** the testimony is the product of reliable principles and methods; and
>>
>> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. We do not accept Taylor's argument that Dr. Arden's past conduct was admissible because "[t]his information goes directly to Dr. Arden's qualifications, which in turn also affects his credibility to the jury and his ability to render opinions on which the jury can confidently rely." (Pl. Br. at 13.) Dr. Arden was offered by Shields as a forensic and anatomic pathologist to provide an opinion about the trajectory of the bullet fired by Shields. (Doc. 52-1, Exh. C, at 28.) We conclude that we did not commit error by rejecting the evidence as it had no place in determining whether Dr. Arden was "qualified as an expert by knowledge, skill, experience, training, or education;" whether his testimony will "help the trier of fact to understand the evidence or to determine a fact in issue;" whether his testimony is based on "sufficient facts or data;" whether his "testimony is the product of reliable principles and methods," and/or whether he "reliably applied the principles and methods to the facts of the case." *See* Fed. R. Civ. P. 702. Rather, it focuses upon Dr. Arden's *administrative responsibilities* at WOCME. We fail to see how these difficulties come into play when we are considering his role as a forensic medical examiner – a role where he unquestionably has significant qualifications. *See infra* p. 4. Evidence pertaining to Dr. Arden's ability to manage an institution fails to address his qualifications as a forensic pathologist. Such evidence does not

provide any reason for why Dr. Arden would not be qualified to offer his opinion concerning the

trajectory of a bullet in a human body as it fails to address his qualifications in this area.

We also reject Taylor's argument under Fed. R. Evid. 608(b).  The admission of

impeachment evidence is subject to the restrictions set out in the Rule, which provides in

pertinent part:

> **(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the ***character for truthfulness or untruthfulness*** of:
>
> > (1) the witness; or
>
> > (2) another witness whose character the witness being cross-examined has testified about.

Fed. R. Evid. 608(b) (emphasis added).  Under Rule 608(b), "[t]he court may *at its discretion*

permit questioning about specific instances of conduct on cross-examination, but only if the

conduct is probative of the witness's character for truthfulness or untruthfulness." *United States*

*v. Williams*, 464 F.3d 443, 448 (3d Cir.2006) (emphasis added); Fed.R.Evid. 608(b).  The party

may not however offer extrinsic evidence of the specific conduct. *Williams*, 464 F.3d at 448;

Fed. R. Evid. 608(b).  In other words, "a party may ask a witness on cross-examination about a

specific instance of conduct probative of that witness's character for truthfulness, but '[i]f the

witness denies the conduct . . . the questioning party must take the witness' answer[.]'" *Andrade*

*v. Walgreens-Optioncare, Inc.*, 784 F. Supp. 2d 533, 536 (E.D. Pa. 2011) (*quoting United States*

*v. Matthews*, 168 F.3d 1234, 1244 (11th Cir.1999)).  Moreover, prior misconduct that is

otherwise permissible under Rule 608(b) must still pass the balancing test of Rule 403. *See*

*Andrade*, 784 F. Supp. 2d at 536 ("If the conduct is sufficiently prejudicial, however, it is within

the discretion of the court to preclude a party from even inquiring about the conduct on cross-examination, pursuant to Rule 403.")

We find that Taylor has failed to meet his burden under Rule 608(b), particularly here, where Fed. R. Evid. 403 is implicated. The evidence Taylor sought to introduce concerned such matters as the manner in which bodies were stored at the WOCME, the unsanitary and overcrowded condition of the storage room where bodies were stored, the inadequacy of the policies and procedures for conducting autopsies (including allegations of race and religious discrimination in the way bodies were handled), the ventilation in the histology lab and the manner in which waste chemicals were stored and disposed of, a lack of statistical data and annual reports on deaths and autopsies, allegations of sexual harassment, and the circumstances regarding Dr. Arden's separation from the WOCME. (Doc. No. 112, Pl. Supp. Br., Exh. 8, at 14-21). We are unpersuaded that delving into these matters would be useful to establish Dr. Arden's character for truthfulness. *See Williams*, 464 F.3d at 448; Fed.R.Evid. 608(b).

We turn to the introduction of evidence under Rule 608, which necessarily implicates Rule 403. As the Third Circuit explained: "[t]he Rule 403 balancing inquiry is, at its core, an essentially discretionary one that gives the trial court significant latitude to exclude evidence." *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 156 (3d Cir. 2002). The Rule provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403 (emphasis added). We precluded the cross-examination of Dr. Arden based on his past conduct at the WOCME, as we concluded that in addition to the Rule 608 concerns, it would have only confused the issues for the jury. Such evidence would have likely diverted the

jury's attention from the issue of Dr. Arden's credibility as a medical practitioner to his credibility as an administrator. Dr. Arden's conduct as a former administrator was not relevant to his scientific and forensic qualifications and the opinions he rendered.

We further point out the danger of unfair prejudice that could have resulted from admitting the evidence. Unfair prejudice, under Rule 403, "ordinarily concerns the possibility that evidence will entice a trier of fact toward some impermissible inference." *Spear v. Fenkell*, 2016 WL 7474473, at *1 (E.D. Pa. Dec. 29, 2016). The *Spear* court explained: "the concept of 'unfair prejudice' under Rule 403 can encompass simple procedural unfairness, as where a party reverses theories in the middle of trial and the opposing party would be prejudiced unfairly by the lack of notice and an opportunity to prepare for the evidence being introduced." (*Id.*) We note that here we made a concerted effort to maximize trial time before the jury. During the final pretrial conference, I explicitly instructed counsel that:

> [I]t's quite important for all of us – all of us and your clients to convince the jury that we're serious about moving this thing along, and apropos of that **I want to keep sidebar conferences to . . . an absolute minimum**. I'm not going to say never but an absolute minimum, and I'm going to – **first question I'm going to ask you if you call for a sidebar is why hasn't this [been] brought to my attention** . . . before, and there might be a good reason, but I hope there's not a good reason **because if anybody's got something they think they're going to put on that's not part of what was covered they better talk to me about it before Court or during the . . . recess or before we reconvene after lunch** . . . .

(Doc. No. 112, Pl. Supp. Br., Exh. 3, at 70-71) (emphasis added).

Despite this instruction, Taylor's counsel failed to disclose their intent to introduce this disturbing evidence of Dr. Arden's prior conduct to Shields' counsel or to the Court. Rather, Taylor's counsel waited until the last day of trial, during the cross-examination of Dr. Arden, to offer the evidence. We acknowledge that Shields' counsel may have been aware of such prior

conduct, as counsel conceded to such knowledge during the sidebar. However, given our earlier instruction and without prior notice to Shields' counsel of its intended use so that they could prepare for the introduction of such evidence, we conclude that the decision to exclude the evidence under Rule 403 was appropriate. Taylor's counsel had many opportunities to disclose the evidence before and during trial, as they knew since the previous summer that Dr. Arden would be an expert in the case, but they waited until the very last minute to present it. (Doc. No. 112, Pl. Supp. Br., Exh. 8, at 24-25.) Taylor's counsel could have vetted Dr. Arden months before the trial and discovered this information earlier. They could have even brought it to the Court's attention before the start of the trial that morning. We noted counsel's failure to adhere to this initial instruction during the sidebar: "Well first of all as I've told you guys repeatedly I wanted these kinds of issues called to my attention beforehand and now you'[v]e – left me with the last witness in the trial and you raise this issue." (*Id.* at 12.) We cannot accept that Taylor's counsel failed to understand that Shields would object to this evidence and that it would have wasted jury time, as it did, to deal with the issue. As such, in accordance with the wide discretion granted to courts under Rule 403, we affirm our decision to exclude this evidence. Moreover, Dr. Arden denied any wrongdoing in the voir dire. Had this been presented before the jury, the defense would have sought to rebut the broad accusations, which would have pulled the jury's attention further away from the principal issue in the case, mislead the jury about what they needed to focus on, and caused confusion of the issues.

### b. Dr. Arden's Qualifications Under Fed. R. Evid. 702

In addition to his argument under Rule 702, Taylor argues that "[a] new trial is warranted because the Court erred in admitting the . . . testimony of Dr. Johnathan Arden, in which he opined as to the trajectory of the bullet that struck Plaintiff . . . ." (Pl. Br. at 17.) First, Taylor

argues that Dr. Arden was not qualified to testify as to the areas of bullet trajectory and firearm ballistics. (*Id.* at 20.) He contends that a forensic pathologist, like Dr. Arden, lacks experience or training in the areas of bullet trajectory or ballistics. (*Id.*) He explains: "[w]hile Dr. Arden was qualified to read and interpret medical testing such as CT scans, he is not qualified to opine as to anything related to handguns, shooting stances, bullet trajectory, physics, trigonometry, scene reconstruction, or ballistics."[5] (*Id.*) Moreover, Taylor asserts that Dr. Arden's diagram in his report demonstrates his lack of "skill or knowledge greater than the average layman" as required by Rule 702. (*Id.* at 21.) The diagram, he explains, is "unsophisticated" as it includes stick figures, bullets passing through a one-dimensional body, bullet lines that fail to account for gravity, and round numbers indicating the height at which Shields fired the gun and the height/angle of Taylor's body when shot. (*Id.*)

Second, Taylor argues that Dr. Arden's methods were "not reliable, and instead rel[y] on unfounded assumptions and guesses on his part, rather than accepted scientific practices or methods." (*Id.* at 22.) To begin, Taylor asserts that Dr. Arden at trial and in his report could not actually point to the final landing spot of the bullet inside his body, stating it was somewhere between 1.6 to "approximately" 2.75 inches below the entrance wound. (*Id.* at 23.) He also argues that Dr. Arden merely estimated the depth of Taylor's torso and speculated as to the bullet's path inside his body when reaching his conclusion. (*Id.*) Next, he states that even though Dr. Arden is shorter and weighs less than Taylor, he guessed as to the angle that Taylor was lying on the floor by lying on his own office floor. (*Id.*) Taylor explains that Dr. Arden's "entire set of opinions were premised on the fact that Taylor was shot at or near the xiphoid process" but

---

[5] His report, Plaintiff also asserts, "indicates his opinions are within a reasonable degree of *medical* certainty, even though he is opining as to scientific areas of ballistics and bullet trajectory." (*Id.*)

"he could not even tell the positioning of the xiphoid relative to the ground at the time of shooting." (*Id.* at 9.)  Moreover, Taylor argues that Dr. Arden was basing this opinion on CT scans taken ten days after the incident and several surgeries. (*Id.*)

Taylor further asserts that Dr. Arden's methodology is not reliable because Dr. Arden assumed "that the angle at which the bullet travelled *inside* the body is automatically the same angle in which the bullet travelled from the gun to Taylor." (*Id.* at 23.)  Such an assumption, he states, contradicts the testimony of the treating physician, Dr. Kahn. (*Id.*)  Furthermore, Taylor argues that there are many ways in which a bullet may change directions inside the body and that "while Dr. Arden claimed that bullets always travel straight inside the human body, this was not in his report and was contradicted by the testimony of Plaintiff's rebuttal expert Ken Katsaris, who testified that hollow point bullets such as the one used on Taylor are designed to change shape inside the human body." (*Id.*)  He then argues that Dr. Arden improperly assumed Shields' shooting stance without knowing his height or viewing him in a shooting stance, and improperly assumed he and Shields were standing at level heights even though Shields testified that he was on the front step when he fired the shot. (*Id.*)  Taylor goes on, stating that Dr. Arden drew opinions based on his limited knowledge of trigonometry and geometry and that such an approach at scene reconstruction fails the reliability standard under *Daubert*.  (*Id.* at 24.)  He also contends that Dr. Arden's conclusions, attempting to disprove Taylor's version of the events, were "not mathematically sound" and his diagram was "wholly unreliable" as the diagram assumed a scenario where Taylor was shot in the leg, not the abdomen (where he was actually shot). (*Id.*)  Moreover, he argues that although it went beyond his medical background, "Dr. Arden opined as to the angle and trajectory of the bullet, and the positioning of the individuals,

thereby reconstructing the scene, and basing his opinions with facts not in evidence." (Pl. Supp. Br. at 7.)

Taylor also contends that Dr. Arden's opinion fails to meet the factors for reliability under *Daubert*.[6] (*Id.* at 26.) He explains that (1) Dr. Arden's calculations cannot be tested as the "approximations" were not based on actual math; (2) his techniques have not been subject to peer review as he is not a ballistics expert and he does not cite any publications to support his method; (3) there is a large potential for error as he guessed the numbers in his diagram and the underlying math is erroneous; and (4) Dr. Arden's assumption that the angle in which the bullet travelled through Taylor's body is automatically the same as the angle the bullet travelled through the gun is not generally accepted in the ballistic community. (*Id.*)

Finally, Taylor asserts that Dr. Arden's report did not fit the facts of the case as required under the final prong of Rule 702. (*Id.* at 28.) He argues that the diagram reflects a scenario where he was shot in the leg rather than the abdomen and that such a scenario is "entirely irrelevant and is thus not helpful to the jury." (*Id.* at 28-29.) He further contends that to the extent portions of Dr. Arden's report were relevant, it should have been excluded under Rule 403 as the probative value of his report was "substantially outweighed by the degree to which his report is confusing, misleading, and improper." (*Id.* at 29.) More specifically, he argues: "[t]he jury should not have been allowed to hear scientific testimony by a non-scientist, where unscientific methods are used, facts are guessed, and round numbers consistently take the place of precise calculations." (*Id.*)

---

[6] The non-exhaustive factors are as follows: (1) whether the theory or technique can be tested; (2) whether the theory has been subjected to peer review; (3) whether there is a known or potential rate of error; (4) whether standards exist for the application of the theory; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community. (Pl. Br. at 26; *citing Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-4 (1993)).

We reject Taylor's argument. The Third Circuit has explained that "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997). The Rule requires that: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *Id.* To begin, we first assess whether Dr. Arden was qualified to offer an opinion on the positioning of Shields and Taylor when the gun was fired. The Third Circuit provides:

> For a court to qualify a witness to testify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony. The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials' . . . . We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualification of experts.' However, 'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'

*Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal citations omitted). Dr. Arden's education, experience, and training far surpass that of an average layman. He has completed a residency in anatomic pathology, received training in forensic pathology, is certified in both forensic and anatomic pathology and licensed to practice medicine in five states, he has published articles and delivered lectures in these fields, he has worked for over twenty years as a medical examiner, and he currently provides consulting services in forensic pathology in medicine and works part time as a forensic pathologist in the Office of the Chief Medical Examiner for the State of West Virginia. Dr. Arden has also testified over 800 times as an expert witness, "concerning the determination and analysis of bullet trajectories within bodies,

**including the assessment of the relative positioning between a gun and the person shot by the gun**." (Doc. No. 52-2, Exh. E, at 6, ¶ 7) (emphasis added).

One such case, uncontested by Taylor, was *Morfiah v. City of Philadelphia*, Civ. No. 13-cv-05995-MSG, before Judge Goldberg. (*Id.* at ¶ 8.) In that case, Dr. Arden opined as to whether or not a decedent was pointing a gun at an officer when two officers fired their weapons. (*Id.* at ¶ 9.) One of the officers testified that the decedent pointed a gun at him, which is why he fired his weapon. (*Id.* at ¶¶ 10-11.) The plaintiff, on the other hand, argued that the decedent never pointed a gun at the officer. (*Id.*) After reviewing the statement and testimony of the officer as well as the forensic evidence, Dr. Arden opined that the evidence revealed the decedent was pointing a gun at the officer. (Doc. No. 52-2, Exh. E, at 7, ¶ 12.) He concluded that the path of the bullet from the "officer's gun entering the decedent's hand between two of his knuckles, striking the wooden grip of the gun the decedent was holding, and exiting at the palm of the decedent's hand was consistent with the decedent pointing the gun in the direction of the officer." (*Id.* at ¶ 12.) Moreover, as Dr. Arden explained in his Declaration, which was also uncontested by Taylor, "[w]ound ballistics is indeed a core component of forensic pathology, which is the only medical subspecialty that routinely addresses such issues." (*Id.* at ¶ 25.) We find that Dr. Arden's extensive education, experience, and training surpasses the threshold for qualification set out by the Third Circuit, specifically that "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir.1987). Dr. Arden's medical background qualified him to opine as to the trajectory of the bullet inside the human body and his training as a forensic pathologist, along with his extensive experience with gunshot cases, qualified him to opine as to

the path of the bullet trajectory. As such, we conclude that Dr. Arden was qualified to offer an opinion on the relative positions of Taylor and Shields at the time of the shooting.

Second, we next assess whether Dr. Arden's opinion was reliable under Rule 702. Under this prong, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *In re Paoli R.R Yard PCB Litig.*, 35 F.3d 717, 742 (1994) (*citing Daubert*, 509 U.S. at 589). The Third Circuit explains that the opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (*quoting Paoli*, 35 F.3d at 742). We find that Dr. Arden's credentials – specifically, his extensive training in anatomic and forensic pathology, his experience as a forensic pathologist, and the more than 800 times he testified as an expert witness about bullet trajectories -- reflects his aptitude in this area and establishes the credibility and reliability of his work. *See* Doc. No. 52-2, Exh. E, at 6, ¶ 7. Dr. Arden's methodology was simply to compare the medical evidence with the differing versions of the shooting offered by Taylor and Shields. While Taylor argues that Dr. Arden improperly conducted a scene reconstruction to arrive at his opinion, Dr. Arden specifically testified that a scene reconstruction was:

> [V]ery much **not** what I was requested to do or what I did do. **I didn't do a scene reconstruction or a shooting reconstruction. I did a comparison between the known evidence of the gunshot wound and the two different stories that were provided, given the differences of relative positioning at the time of the shooting**, and it's really – it's a comparison of does the evidence fit one or not, does it fit the other one or not, but this is not a reconstruction . . . . I am not opining as to their exact positions . . . . I am talking about the relative positioning as one described it and the other described it, the two being vastly different.

(Doc. No. 112, Pl. Supp. Br., Exh. 7, at 123-24) (emphasis added). Moreover, Dr. Arden explained in his report that "[i]n fact, any informal common sense approach to this scenario yields the same result . . . . Both by the common sense approach and by manipulating the factors in the scale diagram, the target surface of the front of the body would have to be sitting up at nearly a 90° angle in order to create a downward trajectory of the gunshot wound." (Doc. No. 52-1, Exh. C, at 29.)

Furthermore, we find that Taylor was not prejudiced by admitting the report and testimony of Dr. Arden as his counsel was given the opportunity to fully cross-examine Dr. Arden such as to reveal any flawed assumptions or faulty analysis. (*See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") Taylor's counsel even presented a rebuttal witness, Mr. William Kenneth Katsaris, a police practices expert, to undermine Dr. Arden's methodology and opinions. (Doc. No. 112, Pl. Supp. Br., Exh. 7, at 195-202.) Mr. Katsaris testified as to the path a .45 caliber hollow point bullet, such as the one that hit Taylor, takes when it makes contact with a human body. (*Id.* at 195-96.) He explained that "[t]he bullet may vary in its pathway." (*Id.* at 197.) Mr. Katsaris also testified that because there was no exit wound on Taylor's body, this could complicate the trajectory because as the bullet flattens it "start[s] to rotate and move so that it's not in the exact position." (*Id.* at 198-99.)

Taylor's counsel also presented the testimony of Dr. Mohammad Ifran Khan, the on-call trauma surgeon when Taylor was hospitalized, who testified about the path the bullet took inside Taylor's body. (Doc. No. 112, Pl. Supp. Br., Exh. 6, at 93-98.) Dr. Khan testified that "the bullet took a strange pathway. It went from his chest, into the abdomen, injured his liver, went back,

took like a curve back into his chest, and then hit his right lung." (*Id.* at 98.) He then stood up in front of the jury and anatomically showed them where and how the bullet traveled. (*Id.* at 98.) Dr. Khan also presented x-rays to the jury showing where the bullet landed inside Taylor's body. (*Id.* at 100-102.) He also testified that "bullets can travel the way they want. They can – these are high velocity particles, so they can hit a bone in the way and then can move in different directions." (*Id.* at 105.) Finally, Taylor's counsel again took the opportunity to undermine Dr. Arden's methodology and opinion in his closing argument. (Doc. No. 112, Pl. Supp. Br., Exh. 9, at 55-56 and 112.)

Moreover, Taylor's counsel also presented the testimony of Lieutenant Steve Nolan from the Philadelphia Police Department, who testified that he was unable to determine Taylor's exact positioning at the time of the shooting because there was no exit wound. (Doc. No. 112, Pl. Supp. Br., Exh. 6, at 75.) Lieutenant Nolan testified that he could only calculate an approximate position because different witnesses gave different accounts. (*Id.*) Moreover, Lieutenant Nolan went on to say that "Mr. Taylor sustained what's called a penetrating gunshot wound, that means the shot that struck him stayed in . . . . It did not pass through [his body]. There were no points of reference other than the one single gunshot on his body." (*Id.* at 76.) As such, because there was no exit wound – and because the witnesses gave different accounts – Lieutenant Nolan concluded he was unable to determine Plaintiff's position at the time the bullet struck him. (*Id.*)

Given these reasons as well as Rule 702's "liberal policy of admissibility," we conclude that Taylor has failed to establish why the Court erred in its discretion of allowing Dr. Arden's testimony. *See Kannankeril*, 128 F.3d at 806. Moreover, Taylor also failed to raise any

significant issue regarding Dr. Arden's methodology that he has not already addressed through

his cross-examination of Dr. Arden.[7]

_____

[7]     We also address Taylor's argument concerning the diagram below – depicting bullet trajectories in this case – that Dr. Arden attached to his report:



(Doc. No. 52-1, Exh. C, at 31.)  Taylor argued several times that Dr. Arden's diagram was unreliable as it was based on his limited knowledge of geometry and trigonometry and was not "mathematically sound." (Pl. Br. at 23-24.)  Taylor insists that the diagram improperly reflects a scenario where Plaintiff was shot in the leg rather than the abdomen. (*Id.* at 28-29.)

However, contrary to Taylor's understanding, the diagram is simply a side-view of the shooting scenario as offered by Taylor – with him lying on the floor and propped up on an elbow facing the door when Shields shot him.  It shows the trajectory of the bullet if fired from 4 feet above the ground at distances of 10 and 15 feet away, toward a target which was 12 inches above the ground and angulated at 25 degrees off the horizontal.  (*Id.* at 29.)  The diagram was created to show that under the scenario Taylor described, the bullet trajectory would have been angled **upward** relative to the body. (*Id.*)  Dr. Arden explained that Taylor's actual gunshot wound trajectory was angled downward, establishing that Taylor's scenario was inconsistent with the medical evidence of his gunshot wound. (*Id.*) Shields' account, however, that Taylor was standing and pointing a gun at him, was consistent with the evidence.

Dr. Arden and Shields' counsel repeatedly explained that, contrary to Taylor's assertion, the diagram was not a trigonometric analysis and it did not purport to derive the angle that Taylor's torso was from the ground during the incident or indicate the height or location of the entrance wound. After being asked on direct examination what the law of sines and cosines had to do with his analysis, Dr. Arden responded:

> It had **nothing to do** with my analysis, because I wasn't reconstructing using geometry and trigonometry, what a position was or what an angle was.  I was relying on the actual evidence to set the scene as to positioning and angles . . . I was relying on the medical evidence, I was relying on the prior testimony.  I didn't do trigonometry to try to create or figure out an angle, so the law of si[nes] and that kind of thing doesn't play into what I did at all.

Finally, we conclude that Dr. Arden's expert testimony assisted the trier of fact as it was relevant to resolving the conflicting scenarios offered by Taylor and Shields. Dr. Arden has specialized knowledge as a forensic pathologist and medical examiner which assisted the jury in interpreting and understanding the objective medical evidence of Taylor's gunshot wound. Moreover, while Taylor argues that Dr. Arden's diagram reflects a scenario where he was shot in the leg rather than the abdomen, we reject such an argument as incorrect and irrelevant for the

(Doc. No. 112, Pl. Supp. Br., Exh. 7, at 124.) Dr. Arden also testified that in his diagram, "[t]he location of the entrance wound is a given. That's something we know from the medical records. It's not something that I have derived or determined." (*Id.* at 143.)

Dr. Arden thoroughly explained at trial the purpose and dynamics of the diagram. He stated that the distances of 10, 15, and 20 feet were consistent with the Defendant's descriptions as: "[a]t one point he said 15 feet, [and] at one point he said 10 to 20 feet." (Doc. No. 112, Pl. Supp. Br., Exh. 7, at 142.) Dr. Arden assumed Shields had the gun in a "typical shooting stance, namely close to or slightly below shoulder height, for which [he] used four feet." (Doc. No. 52-1, Exh. C, at 29.) Dr. Arden then explained:

> [B]ased on the measurements of human bodies and taking my own person onto the floor and propping up on an elbow and using a ruler, I've determined that the front of the chest where the xiphoid is, the actual entry point of this bullet would be **roughly a foot above the ground**, and the angulation of the torso would be **roughly 25 degrees**. **Again, you can shift these thing[s] a little bit but it doesn't change the end result, and therefore the basis of my opinion.**

(Doc. No. 112, Pl. Supp. Br., Exh. 7, at 145) (emphasis added). Dr. Arden explained that even after performing the analysis with the greatest distance of 20 feet away and lowering the gun even further to three feet above the ground, this only "magnified" (increased) the effects of the upward angulation of the bullet trajectory. (*Id.* at 142.) In other words, Dr. Arden stated that

> You almost have to get him seated upright at 90 degrees . . . whether you put the gun at four feet or three feet, whether you do the 5, the 10, the 15, the 20 feet, you have to get him almost upright before you can get to a downward trajectory relative to his body, so all it does . . . [is] change the degree of upward trajectory, but it will not change that it is an upward trajectory.

(*Id.* at 180.) The diagram was simply a visual showing gunshot trajectories, which was helpful for the jury to understand the science behind bullet paths. As such, we do not find any significant issues with Dr. Arden's testimony nor his diagram that would cause his opinion to be deemed unreliable.

reasons previously discussed. We also reject Taylor's assertion that Dr. Arden's testimony should have been excluded under Rule 403 as Taylor has failed to show how Dr. Arden's report is "confusing, misleading, or improper."

### B. Whether The Court Erred In Issuing Conflicting Rulings On The Issue Of The City's Police Officer Off-Duty Policy, Memorandum 98-1

We now turn to Taylor's argument concerning our rulings with respect to the use of the City of Philadelphia's Off-Duty Policy, Memorandum 98-1. We set out the parties' positions followed by our analysis. We conclude that Taylor was not prejudiced and deny a new trial on these grounds.

#### 1. Taylor's Argument

Taylor first argues that the Court erred in issuing conflicting rulings regarding the use of the off-duty policy. (Pl. Br. at 30.) The off-duty policy requires off-duty officers to immediately call 911 and to remain a good witness. (Pl. Br. at 31; *citing* Doc. No. 95, Pl. Br., Exh. G, at 2-3.) If the officer is getting involved, "the officer will clearly identify himself/herself to the parties involved . . . by displaying identification card and/or badge, if practical." *See* Pl. Br. at 31; Doc. No. 95, Pl. Br., Exh. G, at 2. Taylor explained that at the pre-trial conference and at the outset of trial, the Court permitted the use of the policy. (*Id.*) However, "after Plaintiff's counsel had referenced the policy in opening statements and began to use it in witness questioning, the Court ruled during a break in the middle of questioning that it was changing its position and that 98-1 could not be used." (*Id.*)

Taylor next asserts that the Court erred in ultimately prohibiting the use of the policy altogether. (*Id.*) He points to *Burger v. Mays*, 176 F.R.D. 153 (E.D.Pa. 1997), a 4th Amendment excessive force and search/seizure case, where the plaintiff sought to admit a police procedures expert to testify that: (1) the defendant failed to follow police policy when he seized the plaintiff

and (2) the defendant's use of force was unreasonable. (Pl. Br. at 32 (*citing Burger*, 176 F.R.D. at 156).) The Court permitted the testimony and "found that the issue of whether the defendant followed proper police procedures 'is relevant to the jury's determination that the defendant unlawfully seized and assaulted the Plaintiff.'" (Pl. Br. at 32 (*citing Burger*, 176 F.R.D. at 156).) The Court found that the testimony would not be too confusing for the jury and would not intrude upon the jury's role. (Pl. Br. at 32 (*citing Burger*, 176 F.R.D. at 156).) Taylor contends that same rationale applies here, arguing that it:

> [W]ould have been helpful to the jury in establishing Shields' willingness to ignore police policies and insert himself into a situation, which shows his gung-ho attitude towards proper police procedure, and it also is relevant when considered in conjunction with his other conduct and policy violations during the incident; Shields repeatedly escalated the situation unnecessarily; by failing to call 911 and instead inserting himself into the situation, by attempting to grab Taylor, by chasing Taylor, by running into the home, and finally by shooting Taylor.

(Pl. Br. at 32.) Taylor asserts that Shields failed to follow the policy as he did not call 911, did not clearly identify himself, and even after the shooting accident did not call 911 for five minutes. (*Id.*) This conduct, he contends, "can be seen as evidence that he realized that he had erred in shooting Plaintiff and panicked instead of calling 911 immediately." (*Id.*)

Taylor explains that the effect of the Court's ruling "severely prejudiced" him. (Pl. Supp. Br. at 15.) His counsel states that he had relied on the Court's initial rulings in creating his trial strategy and accordingly promised the jury in the opening argument that such evidence would be presented. (*Id.*) However, due to the change in rulings, counsel was prevented from using such evidence and was thus prejudiced. (*Id.*)[8]

---

[8]     At oral argument on May 15, 2017, Taylor also requested that the Court defer its ruling on the motion for new trial until a decision was issued by the Supreme Court of the United States in *County of Los Angeles v. Mendez*, 815 F.3d 1178 (9th Cir.), *cert. granted in part sub nom.*,

137 S. Ct. 547, 196 L. Ed. 2d 442 (2016).  Taylor argued that *Mendez* was applicable to this case and that the Supreme Court's ruling could have "significant ramifications."  *See* Doc. No. 118, at 1.  In *Mendez*, the Los Angeles County Sheriff's Department was notified by a confidential informant that a "potentially armed and dangerous parolee-at-large had been seen at a certain residence." *Cty. of Los Angeles, Cal. v. Mendez*, No. 16-369, 2017 WL 2322832 at *2 (U.S. May 30, 2017).  Upon arrival, officers searched the main house and two deputies searched the back of the property. *Id.*  The deputies were unaware that Mendez and Garcia (neither of whom was the parolee) were sleeping inside a shack on the back property. *Id.*  The deputies opened the door of the shack without a warrant or announcing themselves.  *Id.* at *3.  Mendez stood up holding a BB gun that he used to kill insects in their home.  *Id.*  One of the deputies yelled, "Gun!" and the two deputies started shooting, hitting Mendez and Garcia multiple times. *Id.*  The parolee was never found.  *Id.*  Mendez and Garcia filed suit under 42 U.S.C. § 1983 bringing a warrantless entry claim, a knock-and-announce claim, and an excessive force claim. *Id.* at *4.  As relevant here, the trial court found that the deputies' use of excessive force was reasonable but then held them liable under the Ninth Circuit's provocation rule, "which makes an officer's otherwise reasonable use of force unreasonable if (1) the officer 'intentionally or recklessly provokes a violent confrontation' and (2) 'the provocation is an independent Fourth Amendment violation.'" *Id.*; *citing Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002).  The Court of Appeals affirmed the use of the provocation rule to hold the deputies liable. *Mendez*, 2017 WL 2322832 at *5.  The Supreme Court then granted certiorari.

Following oral argument, the parties submitted supplemental briefing arguing the applicability of *Mendez* to this case. *See* Doc. Nos. 118 and 119.  Before the Court entered a decision on Taylor's request to defer our ruling, the Supreme Court issued its decision on May 30, 2017. *See Cty. of Los Angeles, Cal. v. Mendez*, No. 16-369, 2017 WL 2322832 (U.S. May 30, 2017).  The Supreme Court delivered a unanimous opinion holding that the provocation rule "is incompatible with our excessive force jurisprudence.  The rule's fundamental flaw is that it uses another constitutional violation to manufacture an excessive force claim where one would not otherwise exist." *Id.* at 6.  The Court goes on to explain that "[a]n excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances.  It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation . . . ." *Id.* at 7.  The Court found that the provocation rule includes a "vague casual standard" and while the reasonableness standard examined objective factors, the provocation rule improperly "looks to the subjective intent of the officers who carried out the seizure." *Id.* at 9. As such, the Court reversed and remanded the Court of Appeal's decision. *Id.* at 11.

In line with the Supreme Court's ruling, we conclude that Taylor is barred from invoking the provocation doctrine to create an additional theory of liability against Shields.  Notwithstanding the Court's ruling, we note that Taylor never even presented such a theory at trial.  Specifically, the claim presented to the jury was whether Shields' use of deadly force was reasonable, not whether an independent Fourth Amendment violation provoked Shields' use of force or was the proximate cause of Taylor's injuries.

### 2. Shields' Response and The Court's Analysis

Shields responds arguing that "the record clearly demonstrates that Plaintiff was not prejudiced by the Court's ruling at trial on the admissibility of the off-duty policy." (Def. Supp. Br. at 3.)  He asserts that Taylor's counsel (1) cross-examined Shields on the content of the off-duty policy, (2) presented a rebuttal witness who testified about best police practices, and (3) highlighted Shields' failure to follow such practices in his closing argument. (*Id.*; *citing* Doc. No. 112, Pl. Supp. Br., Exh. 5, at 61-70, 97-109, 122-23, 132-36, 145-46, 153, 175, and 177; Doc. No. 112, Pl. Supp. Br., Exh. 7, at 30-42 and 47-48; Doc. No. 112, Pl. Supp. Br., Exh. 9, at 55-56 and 112.)  Moreover, he argues that the Court was within its discretion to ultimately exclude Policy 98-1. (Def. Br. at 8-9.)  He points to *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009), where the Third Circuit concluded the trial court did not abuse its discretion by excluding directives that would have "lead the jury to equate local policy violations with constitutional violations" as this would have confused the issues for the jury.

We agree with Shields' position and reject Taylor's argument which ignores not only his references to the policy earlier in the trial but also the permission granted to Taylor to raise those points identified in the directive allowing the jury to consider them in deciding whether Shields did or did not use excessive force.  To begin, Taylor's counsel not only referenced but also discussed policy 98-1 in detail in his opening statement.  (Doc. No. 112, Pl. Supp. Br., Exh. 4, at 146.)  Taylor's counsel himself notes this in his motion, quoting the following portion of his opening statement:

> But in deciding those facts you're going to decide a number of things in addition to the testimony and credibility, **but of certain policies that are in fact in effect as it relates to police officers** . . . . They're trained on doing certain things . . . . **And one of those things is the policy that relates to off-duty officers.  You're going to see a directive that was in effect at the time.  And it**

**essentially states the following, and you'll hear testimony from it: That off-duty officers are not to engage if they think something is wrong, if there's a crime, when practical. So it's not life-threatening at the time, and Officers Shields will tell you when he saw him walking there, he wasn't threatened, nobody was threatened. So what officers off-duty are to do, they're to call 9-1-1 and be a good witness . . . . Also, as part of that policy there are other things a police officer is to do . . . and that is they are to identify themselves. So if they feel that they need to engage, and Officer Shields felt that he needed to engage, they are to show their badge, they are to show their ID and that they are clearly, to clearly identify themselves as a police officer.**

(*Id.* at 145-147.)  We note that neither the Court nor opposing counsel interrupted or objected to this reference in the opening argument. As such, the jury was well aware that off-duty officers have a standard of responsibilities pursuant to a directive – specifically, policy 98-1.

Taylor's counsel also explicitly referenced the policy again in Shields' cross-examination *before* the Court ruled that the off-duty police was itself inadmissible:

Q. --- is that correct?  Now, so when you walked outside, or when Josh was walking by you, and if I just turn on my phone here and go  9-1-1, how long does that take?

A.  Seconds.

Q.  Exactly.  And what you're telling me and telling this jury is that what you're supposed to do, **pursuant to policy**, is to call 911, but you had no time?

A.  That's correct.
…

Q. That is correct.  Now, **with respect to policy regarding calling 911 when you're off duty**, do you recall in the policy that the policy indicates that you are to identify yourself by showing your badge and your ID, are you familiar with that?

A. Yes.

(Doc. No. 112, Pl. Supp. Br., Exh. 5, at 65 and 70.)

Moreover, even after the Court's ruling, Taylor's counsel tediously and at length cross-examined Shields as to the substance of the off-duty policy and whether his actions that day conformed with the responsibilities of off-duty policers in situations such as the one involved here. *See* Doc. No. 112, Pl. Supp. Br., Exh. 5, at 61-70, 97-109, 122-123, 132-135, 135-136, 146, 153, 175, and 177. Counsel even created a demonstrative aid on an easel that he placed before the jury where he went through the events of the afternoon with Shields and highlighted each time he failed to call 911, show his badge, or explicitly identify himself, as required by the off-duty policy. *See Id.* at 61-70. The Court did not strike such notations from the record nor did the Court instruct the jurors to disregard mention of the policy.

Taylor also presented a police practices expert, Ken Katsaris, to testify regarding the best practices of an off-duty police officer. (Doc. No. 112, Pl. Supp. Br., Exh. 7, at 30-42 and 47-48.) The testimony delved into the practices required by the Philadelphia Police Department for off-duty police officers – i.e., calling 911, remaining a good witness, and identifying yourself as an officer -- and then Mr. Katsaris provided his opinion as to whether Shields' actions were in conformity with those practices on the day in question. (*Id.*) In closing argument, Taylor's counsel again highlighted that Shields had time to call 911, to show his badge, and to identify himself to Taylor. (Doc. No. 112, Pl. Supp. Br., Exh. 9, at 55-56, 112.) Finally, we also note that in the charge given to the jury, the Court made specific mention to applicable off duty police officer "polices and directives":

> Now you've heard evidence during the trial about certain police department policies and practices concerning the conduct of the officers, here relating to Officer Shields use of his firearm in the situation as it presented itself to him at the time of the shooting. **You also heard some references to policies and directives applicable to officers who are off duty . . . .** Now, you may consider whether the officer's conduct, such as you find the conduct to be, **whether or not it was in conformity with proper**

**police practices and procedures.**  You'll recall Mr. Katsaris on the side for the Plaintiff and Mr. Ryan for the Defendants for testimony on some of these points.

**So while you may consider whether the conduct was in conformity with police policies or practices**, but I charge you that even if you were to find that his conduct was not in conformity with proper police practices and procedures, you may not conclude from that failure to conform to proper police policies, practices, and procedures automatically gives rise to a violation of Mr. Taylor's Constitutional rights.

(*Id.* at 36-37).  Given this extensive questioning and presentation by Taylor's counsel of the substance of the off-duty policy, the earlier reference of such a policy, and the mention of an off-duty policy in the jury charge, we conclude that Taylor was not prejudiced by any conflicting rulings regarding the off-duty policy.

Accordingly, while we ruled that the off-duty policy was itself inadmissible, Taylor took full advantage of the opportunity to develop these elements that are contained within the policy. As Shields correctly pointed out in his response, "Plaintiff's reliance on *Burger v. Mays* is not helpful to him because in *Burger*, the Court allowed testimony about police procedures that was directly relevant to the core issues in the case – reasonable use of force and proper techniques for apprehension." (Def. Br. at 4.)  The core issue in this case was whether Shields' use of deadly force was reasonable.  As Policy 98-1 focused on whether Shields should have called 911, remained a witness, or identified himself, ***not*** whether Shields' use of force was reasonable, it was not directly relevant to the core issue. *See* Doc. No. 112, Pl. Supp. Br., Exh. 5, at 88-89 (noting at sidebar that the use of the directives is limited to questions concerning the use of force).

We hold to that position and are supported by *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009), where the Third Circuit held that it was within the trial court's

discretion to exclude evidence of police directives in a civil rights case. It explained that "the [trial court] concluded that the directives had the potential to lead the jury to equate local policy violations with constitutional violations, and that this risk of confusing the issues substantially outweighed the directives' probative value. We do not find that in making this determination the Court abused its discretion." (*Id.*) We explained similar concerns during the sidebar for our ruling to exclude policy 98-1:

> For you to raise questions with respect to whether or not it was – you know, what he might have done, whether he could have done other things, so forth and so on, I think that's perfectly fine. But as you know, as you well know, **the issues with respect to compliance or lack of compliance with directives does not make out the Constitutional tort. I believe that on the central issue in the case, which is the reasonableness or lack of reasonable objectively for his conduct at that time of the shooting, you should be permitted to make – raise issues concerning these directives to see if it has an impact upon the jury's consideration as to that central question**. Nevertheless, I do not believe . . . that the conduct previously, that is to say the off-duty conduct as it concerned what he was doing in his off-duty status, the area that you're now in, the directives were not to be used.

Doc. No. 112, Pl. Supp. Br., Exh. 5, at 73-74. Accordingly, in line with the discretion granted to us in *McKenna*, we affirm our ruling to exclude the off-duty policy as the probative value of the off-duty policy with respect to the conduct of off-duty officers was outweighed by the risk that the jury would confuse that directive with constitutional standards from the use of excessive force – the core issue in the case.

## V.     CONCLUSION

For the reasons set out above, we deny Plaintiff's motion for new trial. An appropriate order follows.

BY THE COURT:

/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE